## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

| | |
|---|---|
| SHAWN A. DROVESKY ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 05-4093 |
| ) | |
| JO ANNE B. BARNHART, Acting ) | |
| Commissioner of Social Security ) | |
| Administration ) | |
| ) | |
| Defendant. ) | |

**ORDER**

This matter is now before the Court on Plaintiff Shaw Drovesky's ("Drovesky") Motion for Summary Judgment and the Defendant Commissioner's Motion to Affirm. For the reasons set forth below, Drovesky's Motion for Summary Judgment [#13] is DENIED, and the Commissioner's Motion to Affirm [#17] is GRANTED.

**Background**

Drovesky was born on July 29, 1961. (R177) He is 6'1'' tall and weighs approximately 235 pounds. Id. Drovesky was never married and does not have any children. (R 96) He has completed high school and two years of college. (R118) In the past, Drovesky has worked as a security guard, a packing clerk at a grocery store, and a warehouse picker. (R113) He was last employed as a dental lab assistant; he held that position for one week. Id.

On May 17, 1999, Drovesky filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging disability due to a spinal fracture, a ruptured

disc, and diabetes.  (R64-65)  His applications were denied initially and on reconsideration. (R63)  Drovesky requested a hearing before an administrative law judge ("ALJ").  (R63)  He then stipulated, through his attorney, that he was disabled through October 6, 1999, but not thereafter.  (R64)  On March 29, 2001, ALJ Jean M. Ingrassia issued a fully favorable decision without a hearing, finding that Drovesky was disabled from May 12, 1998, though October 1999, but not thereafter.  (R63-73)  This decision entitled Drovesky to DIB and SSI benefits through December 1999, the end of the second calendar month after the month in which the ALJ determined that the disability ceased.  (R73)  Drovesky requested that the Appeals Council review the ALJ's decision on May 25, 2001, stating that he disagreed with the ALJ's decision. (R83)  The Appeals Council denied his request, and Drovesky did not seek judicial review of that decision.  (R93)

Also in May 2001, Drovesky again applied for DIB and SSI benefits, alleging a new period of disability beginning on December 31, 1999.  (R96, 200)  He alleged disability due to low back problems, neuropathy, and diabetes.  (R112)  After his application was denied both initially and on reconsideration, Drovesky requested a hearing before an ALJ.  (R79, 81, 92, 213-22)  That hearing was held before ALJ John E. Sandbothe on April 1, 2004, at which Drovesky and vocational expert ("VE") Carma Mitchell appeared and gave testimony.  (R33-59)

Drovesky testified that in 2001, he had intended to start a new job, but that he was not hired.  (R36-37)  He began looking for another job, and then started having some physical difficulties.  Id.  Drovesky also testified that he also enrolled in community college at about the same time, but that he withdrew because he became ineligible to receive the educational grants he had been using to offset the costs of his enrollment, and because he lacked the stamina to

2

walk to the center of campus, where his program's classes were held, and had other physical difficulties with sitting through a full class. (R51-54)

Drovesky testified that he has numbness and pain in his left leg and both feet. (R38) He has lower back pain, which becomes especially painful after walking a block to a block and a half. (R39) He can sit in a car for one and one-half hours at a time and estimated that he could be on his feet for about an hour and a half if aided by a cane, but only 45 minutes if unaided. (R47-49, 52) Drovesky testified that he can lift 10 pounds frequently, and 20 pounds occasionally. (R52) Drovesky also testified that his leg and back pain keeps him from sleeping through the night. (R39, 49) While he was at some point taking Vioxx (R133, 140), Drovesky testified that he now only takes over-the-counter Advil for pain. (R54) Drovesky also stated that he could not afford stronger pain medication, but had not sought free or low-cost prescription pain medication. (R55)

Drovesky cooks his own meals, but cannot complete routine household chores because of chronic pain in his lower back. (R135) The pain sometimes keeps him from concentrating. (R136) He goes grocery shopping about once per week, and leaves his home to visit friends about three times per week. (R135-36) Drovesky reads, watches TV, and listens to the radio. (R56) He enjoys being with other people and belongs to two model-building clubs. (R136)

David L. Gannon, M.D., is one of Drovesky's treating physicians. Dr. Gannon treated Drovesky primarily for his diabetes. Dr. Gannon's treatment notes indicate that in January 2000, Drovesky displayed a decreased range of motion in his left leg. (R157, 192) In May 2001, Drovesky walked with a cane and his gait was antalgic. (R156) Dr. Gannon's treatment notes from June 2002 indicate that Drovesky's gait, station, range of motion, muscle strength and tone were intact. (R191)

Peter Biale, M.D., examined Drovesky in July 2001, at the request of the Bureau of Disability Determination Services. (R159)  Dr. Biale's back examination revealed that Drovesky had full range of motion of the cervical and dorsal spins, but that he had a restricted ranges of motion in the lumbosacral spine.  (R161)  Moreover, Drovesky had decreased sensation in his lower left leg, but he was able to bear his full weight, and his gait was normal.  Id.  Dr. Biale also noted that while Drovesky carried a cane, he was able to walk more than 50 feet without it. (R161)

In August 2001, a state agency physician, Francis Vincent, M.D., reviewed the medical evidence of record and opined that Drovesky could lift 20 pounds occasionally and 10 pounds frequently.  (R165)  Dr. Vincent also reported that he believed Drovesky could stand or walk for a total of at least 2 hours in an 8-hour workday, could sit for a total of 6 hours in an 8-hour workday, and did not have significant restrictions in pushing and pulling activities.  (R165)  Dr. Vincent indicated that Drovesky should never climb ladders, ropes, and scaffolds, but that he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl.  (R166)  In December 2001, a second state agency physician, Dr. Bergmann, reviewed Dr. Vincent's assessment of the evidence and affirmed his conclusions.  (R171)

Stanley Rabinowitz, M.D., examined Drovesky in December 2001, at the request of Illinois Disability Determination Services.  (R172)  Dr. Rabinowitz observed that Drovesky walked with a mild left antalgic gait and did not need a cane to walk within the examining room and office.  (R173)  Drovesky had normal range of motion in his joints and spine, with the exception of his lumbar spine.  Id.  Dr. Rabinowitz opined that Drovesky's diabetes was being successfully treated with insulin, and that there was no evidence of diabetic retinopathy or neuropathy.  Drovesky had trouble squatting, but had no difficulty getting on and off the

4

examining table. (R175). Dr. Rabinowitz noted there did appear to be ongoing nerve root irritation in Drovesky's left leg. Id.

Drovesky also saw David D. Udehn, M.D. Dr. Udehn first examined Drovesky in 1998, after he initially injured his back at work. (R182) Drovesky underwent a hemilaminotomy with lateral recess decompression and forminotomies in June 1998. (R179) Dr. Udehn reported that Drovesky had an 80-90% improvement after the surgery. Id.

In April 2004, after the administrative hearing before ALJ Sandbothe, Drovesky submitted to the ALJ a letter from Dr. Udehn, along with his notes from his examinations of Drovesky in 1998, August 2002, and January 2004. (R176) In the letter, Dr. Udehn opined that Drovesky has the following limitations: he can only walk for 20 minutes, stand for 10 minutes, sit for 30 minutes, avoid bending and stooping, lifting 20 pounds occasionally and 10 pounds frequently, push and pull thirty pounds occasionally and 20 pounds frequently. Id. Dr. Udehn also stated that Drovesky could not return to his regular employment, but that he was probably not totally disabled. Id.

Dr. Udehn's May 1998 treatment notes indicate that an X-ray revealed that Drovesky suffered a mild L1 compression fracture. (R183) Dr. Udehn released Drovesky to light duty work in April 1999. (R193) Drovesky apparently returned to see Dr. Udehn in August 2002, complaining of numbness and pain in his left leg and foot. (R179) Dr. Udehn noted that Drovesky's gait was antalgic and his stance was normal. (R180) Heel to toe walking was unremarkable. Id. While the range of motion in Drovesky's left leg was normal, Dr. Udehn noted a decreased sensitivity to light touch and pinprick in the left foot. Id.

Dr. Udehn's January 2004 treatment notes report that Drovesky had normal range of motion in all limbs and that gait and walking were normal. (R177) Drovesky had a limited

range of motion in his spine.  Id.  Drovesky again had a decreased sensitivity to touch and pinprick in his left leg.  (R178)  Dr. Udehn noted that an MRI of the lumbosacral spine performed on January 13, 2004, revealed a "bulge left L4-5 with foraminal narrowing."  (R178)  Dr. Udehn opined that Drovesky was 50% improved since his surgery and did not recommend further surgery at the time of the exam.  Id.

> The ALJ asked the VE to consider an individual with the following limitations:
>
> Can lift 20 pounds occasionally, 10 pounds frequently, but he could not be on his feet more than two hours total during a work day.  He could only occasionally balance, stoop, crouch, kneel, crawl, or climb.  He could not tolerate extremes of heat, cold, or humidity.  And I'm going to put no – and no vibrations.

(R58-59)  The ALJ asked VE Mitchell if, with those limitations, Drovesky would be capable of any past work.  (R59) VE Mitchell testified that Drovesky could hold the security guard job.  Id.  The ALJ then asked the VE to consider a second hypothetical person:

> Same vocational medical background as before.  However, I'm going to add that he would need to elevate his legs for the majority of the day.  He would also require a slow pace for up to 1/3 of the day.

(R59)  VE Mitchell testified that, with the additional limitation of needing to elevate both legs, the individual would not be employable.  Id.

On September 10, 2004, the ALJ issued his decision.  (R23)  The ALJ found that Drovesky suffers from severe impairments, including early peripheral neuropathy and early retinopathy and a low back disorder, status post hemilaminectomy with lateral recess decompression and foraminotomy, and the removal of a small extruded disc fragment in June 1998 with residual limitations of motion and pain.  (R22)  The ALJ determined, however, that Drovesky does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Regulation No. 4.  Id.  After considering the

6

medical evidence in the record and relevant credibility factors, the ALJ found Drovesky's alleged functional limitations to be not fully credible.  Id.

The ALJ determined that Drovesky has a residual functional capacity to lift 20 pounds maximum occasionally with 10 pounds frequently, can stand or walk for two hours total in an eight-hour day, occasionally he has the ability to balance, stoop, crouch, kneel, crawl and climb, and cannot work with vibrations and cannot tolerate extremes of heat, cold or humidity.  Id.  The ALJ found that Drovesky's past work as a security guard does not require the performance of work-related activities precluded by this residual functional capacity, and none of Drovesky's severe impairments prevent him from performing this past work.  Id.  Therefore, the ALJ concluded that Drovesky was not under a disability as defined in the Social Security Act ("the Act").  Id.

Drovesky submitted a Request for Review of Hearing Decision.  (R10).  On October 24, 2005, the Appeals Council declined review of Drovesky's claim, and the ALJ's decision became the final decision of the Commissioner.  (R5)  This appeal followed.  The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

**Discussion**

In order to be entitled to SSI and DIB, a plaintiff must show that his or her inability to work is medical in nature.  Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits.  *See* 20 C.F.R. §§ 404.1566, 416.966.

The establishment of disability under the Act is a two-step process.  First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected

7

to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. McNeil v. Califano, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. Tom v. Heckler, 779 F.2d 1250 (7th Cir. 1985); Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. Pugh v. Bowen, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by

substantial evidence and whether the proper legal standards were applied.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971).  Credibility determinations made by the ALJ will not be disturbed unless the finding is clearly erroneous.  Anderson v. Bessemer City, 470 U.S. 564, 573 (1985); Imani v. Heckler, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988 (1986).

In his appeal, Drovesky raises essentially two claims:  (1) the ALJ improperly assessed the opinion of one of his treating physicians, Dr. Udehn, and (2) the hypothetical question posed to the VE was flawed.  Each of these arguments will be addressed in turn.

### I.    Treating Physician's Opinion

Drovesky argues that the ALJ erred in his assessment of the opinion of one of his treating physicians, Dr. Udehn.  Specifically, Drovesky argues that Dr. Udehn's opinion is entitled to controlling weight, and the ALJ failed to accord it such weight and instead gave substantial deference to the opinion of a non-treating physician who never examined Drovesky.  Drovesky further argues that the ALJ erred in failing to re-contact Dr. Udehn to seek further clarification of his opinion.  Defendant responds that the ALJ's decision is supported by substantial evidence in the record as a whole.

Dr. Udehn's opinion is not binding on the Commissioner.  Whitney v. Schweiker, 695 F.2d 784, 788 (7th Cir. 1982).  On this issue, the Seventh Circuit has found that:

> The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.  The regular physician also may lack an appreciation of how one case compares with other related cases.  A consulting physician may bring both impartiality and expertise.

9

Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985). However, there is no presumption of bias against a treating physician's disability opinion. Edwards v. Sullivan, 985 F.2d 334, 337 (7th Cir. 1993). Rather, the ALJ, as the trier of fact, must consider the treating physician's possible bias. Id. The Commissioner will not give controlling weight to the treating physician's opinion on the nature and severity of the claimant's impairments unless the treating physician's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques . . ." 20 C.F.R. § 416.927(d)(2), and not inconsistent with other substantial evidence in the record. Dixon v. Massanari, 270 F.3d 1171 (7th Cir. 2001).

It is the province of the ALJ to resolve evidentiary conflicts. Ehrhart v. Secretary of Health and Human Services, 969 F.2d 534, 542 (7th Cir. 1992); Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990). Specifically, "[w]hen treating and consulting physicians present conflicting evidence, the ALJ may decide who to believe, so long as substantial evidence supports that decision." Dixon, 270 F.3d at 1178. The existence of an evidentiary dispute is not grounds for reversing the ALJ's decision to credit one version of facts over another. Herr, 912 F.2d at 181 n.4. However, the ALJ must explain with particularity the basis of his decision. Young v. Secretary of Health and Human Services, 957 F.2d 386, 393 (7th Cir. 1992).

The ALJ's discounting of Dr. Udhen's opinion and subsequent finding that Drovesky has the residual functional capacity to perform his past work as a security guard is supported by substantial evidence. In making this finding, the ALJ did not summarily reject all of Dr. Udehn's opinions regarding Drovesky's limitations. Contrary to the assertions of Drovesky's brief, the ALJ's reasons for not adopting all of Dr. Udehn's opinions were adequately set forth in his written decision and were imminently reasonable.

10

While the ALJ acknowledges the opinion of Dr. Udehn as that of one of Drovesky's treating physicians, the ALJ enumerates several examples in the record of medical opinions, treatment notes, and objective testing that are inconsistent with Dr. Udehn's opinion. While Dr. Udehn opined that Drovesky could only walk for 20 minutes, stand for 10 and sit for 30 minutes, reviewing physicians Dr. Vincent (and Dr. Bergmann) opined that Drovesky could stand or walk for two of eight hours and sit for six of eight hours. Moreover, at the hearing before the ALJ, Drovesky himself testified that he could sit in a car for an hour an half, if uninterrupted, and that he could be on his feet for an uninterrupted hour and half with a cane, and about forty-five minutes if unaided.

The ALJ also explicitly relies on the treatment notes of Dr. Gannon, another one of Drovesky's treating physicians. In June 2002, upon examining Drovesky, Dr. Gannon's treatment notes indicate that Drovesky's gait, station, range of motion and stability were intact, that muscle strength and tone were normal, and that he was neurologically intact, and that his feet were OK. Later, in a September 2003 report, Dr. Gannon indicated that Drovesky's overall condition was stable. The ALJ goes on to enumerate the details of Dr. Biale's 2001 report (summarized *supra* at page 4), as well as Dr. Udehn's own August 2002 report, in which he indicates that a physical examination of Drovesky revealed normal stance, normal muscle tone, no abnormal movements, the ability to heel to toe walk without problem, and regular range of motion testing.[1] (R179-80)

---

[1] Drovesky argues that other doctors besides Dr. Udehn found problems tied to neurological illness. However, in assessing RFC, an ALJ focuses on the severity and persistence of the limitations caused by claimant's impairments, rather than relying solely on the underlying diagnoses. See 20 C.F.R. §§ 404. 1529; 416.929. The ALJ's written opinion does not indicate that the ALJ did not believe Dr. Udehn's diagnosis or that of any of the medical sources. Rather, the ALJ evaluated Drovesky's RFC in light of *all* of the relevant considerations set forth in 20 C.F.R. §§ 404.1529; 416.929.

11

Drovesky rightly points out that in assessing conflicting medical opinion evidence, the ALJs are to consider a variety of other factors, including the length and extent of the treatment relationship, the physician's specialty, and the consistency and supportability of the physician's opinion. 20 C.F.R. §§ 416.927(d)(1), (d)(2)(i)-(ii); Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996). However, while ALJ Sandbothe may not have explicitly discussed certain factors such as the length of treatment relationship between Dr. Udehn and Drovesky, or Dr. Udehn's specialty, the ALJ thoroughly explained the inconsistency between Dr. Udehn's opinion and other evidence in the record. Moreover, the record suggests something of a limited treatment relationship between Dr. Udehn and Drovesky. Drovesky apparently only saw Dr. Udehn two times between the alleged date of onset and the written opinion, with one of those two consultations taking place after the hearing. As the ALJ noted, "[Drovesky] has not had much medical treatment since December 2001 and really very little treatment since 1998." (R21) Furthermore, the letter in which Dr. Udehn set forth his opinions of Drovesky's limitations points to no specific basis for those opinions, such as clinical or laboratory testing. Contrary to Drovesky's assertion, the ALJ's failure to detail in his opinion each relevant piece of evidence in the record it is not reversible error.[2] Books, 91 F.3d at 980 ("[T]he ALJ need not evaluate in writing every piece of testimony and evidence submitted . . . . All we require is that the ALJ sufficiently articulate his assessment of the evidence to assure us that the ALJ considered important evidence and to enable us to trace the path of the ALJ's reasoning."). Again, this Court's inquiry is limited to whether the ALJ's opinion is supported by substantial evidence.

---

[2] In a similar vein, Drovesky argues that the ALJ's failure to mention a January 2004 lumbar spine MRI "alone is reversible error." Petitioner's Brief, at 16. The MRI is but one item from the medical record, there is no indication that the ALJ disregarded it, and the ALJ's failure to mention the MRI in his written opinion is not alone reversible error.

12

Drovesky argues that it was reversible error for the ALJ to rely on Dr. Vincent's opinion of Drovesky's limitations, when Dr. Vincent did not have access to any of Drovesky treatment notes from after August 2001, when Dr. Vincent issued his opinion of Drovesky's limitations. Drovesky argues that he was disabled and entitled to benefits beginning in December 1999. As the Commissioner points out, Drovesky did not report a worsening of his condition to Dr. Udehn after August 2001. The record does not show a change in treatment or medication that suggests a worsening condition after August 2001. Therefore, "ALJ Sanbothe's reliance on Dr. Vincent's opinion is not undermined by the fact that the opinion was issued approximately two years before" Dr. Udehn's opinion. Commissioner's Brief, at 15.

Finally, relying on 20 C.F.R § 404.1512(e)(1), Drovesky also argues that the ALJ erred in failing to re-contact Dr. Udehn. Section 404.1512(e) provides that if the evidence submitted by a treating physician is "inadequate for us to determine whether you are disabled, we will need additional information to reach a determination or a decision." The section continues,

> (e)(1) . . . We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory techniques. We may do this by requesting copies of your medical source's records, a new report or a more detailed report.

20 C.F.R. § 404.1512(e)(1). In <u>Latowksi v. Barnhart</u>, 93 Fed. Appx. 963 (7th Cir. 2004), the Seventh Circuit found, in applying § 404.1412(e)(1), that the ALJ was not required to re-contact the treating physician when the asserted restrictions were contradicted by other substantial evidence in the record, including some of the treating physician's notes, the applicant's own testimony about his daily activities, and the medical findings of other physicians. <u>Id</u>. at 971.

In this case, the record was not undeveloped. Drovesky submitted Dr. Udehn's treatment notes to the ALJ. Had the ALJ discounted Dr. Udehn's opinion because of a lack of objective

findings, then § 404.1412(e)(1) and the ALJ's general duty to develop the record would have required the ALJ to re-contact Dr. Udehn. See id. (citing Smith v. Apfel, 231 F.3d 433 (7th Cir. 2000). But here, similar to Latowski, the ALJ discounted Dr. Udehn's opinion of Drovesky's restrictions because of the volume of contradictory evidence in the record.

Finally, it merits mention that ALJ Sandbothe did not rely exclusively on medical opinion and clinical evidence. The ALJ noted that Drovesky both sought work and attended college after his alleged onset date. Also, the ALJ indicated that while Drovesky alleged severe pain, that pain appeared to be sufficiently controlled with Advil; he rarely sought medical attention and did not seek free or low-cost prescription pain medication. The ALJ concludes, "[Drovesky] testified that he had previously agreed to a closed period of disability because he believed he would get a security job which he did not get. This is not a basis for continuing disability." (R21). In total, the "non-medical" portions of the record also support the ALJ's conclusions regarding Drovesky's RFC and ability to perform his past work.

In conclusion, while the regulations do provide that a treating physician's opinion is entitled to controlling weight in determining whether a claimant is entitled to benefits, this is only true where the opinion is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). In this case, the ALJ recounted extensive evidence that was incompatible with the Dr. Udehn's opinion. The Court does not disagree that the record indicates that Drovesky suffers from the symptoms of neuropathy and back pain, and that these conditions place some limits on his physical abilities. After all, other doctors have noted Drovesky's antalgic gait, neuropathy, and restricted range of motion in his back. However, the record presents disputes regarding the extent of those limits on Drovesky's abilities, and "when treating and consulting physicians present conflicting evidence, the ALJ may decide whom to

14

believe, so long as substantial evidence supports that decision." Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001). This reviewing court will not overturn the ALJ's credibility determinations "unless they are patently wrong." Id. at 1177; Cunningham v. Barnhart, 440 F.3d 862, 865 ("[W]e may not reweigh the evidence or substitute our judgment for that of the Commissioner."). Therefore, this Court will not disrupt the ALJ's decision to not adopt all of the limitations proposed by Dr. Udehn.

**II.    Hypothetical Question**

Drovesky next argues that because the hypothetical question posed to VE Mitchell did not incorporate the proposed limitations asserted by Dr. Udehn, the hypothetical question was flawed and does not constitute substantial evidence to support the ALJ's step-four finding that Drovesky was capable of performing his past work as a security guard.

Drovesky correctly points out that Dr. Udehn's opinion and notes were not part of the record at the time the VE answered the ALJ's hypothetical so the court cannot conclude that the VE considered Dr. Udehn's proposed impairments. However, as explained above, the ALJ reasonably discounted Dr. Udehn's opinion and found that Drovesky did not have certain limitations included in that opinion. It was completely proper for the ALJ to omit from the hypothetical any limitations based on statements by Dr. Udehn that the ALJ found not to be fully credible in light of the record as a whole. Boynton v. Apfel, 172 F.3d 52 (7th Cir. 1999). Because the ALJ's hypothetical question contained the credible limitations reasonably supported by the record, he reasonably relied on VE Mitchell's decision in making his step-four decision. Accordingly, the hypothetical question was proper, and the VE's testimony constitutes substantial evidence for the ALJ's conclusions. See Jens v. Barnhart, 347 F.3d 209, 213 (7th Cir. 2003).

15

## CONCLUSION

For the reasons set forth above, Drovesky's Motion for Summary Judgment [#13] is DENIED, and the Commissioner's Motion to Affirm [#17] is GRANTED.

ENTERED this 28th of February, 2007.

                                                _s/Michael M. Mihm____
                                                Michael M. Mihm
                                                United States District Judge